IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 1:17-cr-302 |
| ) | |
| NIKOLAI BOSYK, ) | |
| ) | |
| Defendant. ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

In light of the novel coronavirus and the COVID-19 pandemic, defendant seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). Nikolai Bosyk downloaded and possessed thousands of videos and images containing child pornography. He acquired this content by visiting websites that catered specifically to individuals interested in obtaining content featuring young boys and girls being sexually abused. He pleaded guilty to receiving child pornography in violation of Title 18, United States Code, Section 2252(a)(2) and was sentenced to 60 months incarceration. The Court should deny his motion. Using compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

**Background**

In affirming the defendant's conviction on direct appeal, the Fourth Circuit described the facts this way:

> The basic facts are these. One day, a link appeared on a secretive online message board. Accompanying the link was a message describing its contents unmistakably as child pornography, as well as numerous thumbnail images depicting sexual molestation of a female toddler. And if you clicked the link, it took you, as promised, to multiple videos of child pornography.
>
> On that same day, an IP address associated with Nikolai Bosyk's house accessed

>the link. Based on these facts, the government obtained a warrant to search Bosyk's home for evidence of child pornography.

*United States v. Bosyk*, 933 F.3d 319, 322 (4th Cir. 2007).

The Fourth Circuit's short recitation of the basic facts illustrate the disturbing nature of the crime in this case. A short, but more comprehensive background of this case follows:

This investigation began in September 2015 when law enforcement began to evaluate information received in a nationwide inquiry into a website, Bulletin Board A, on the dark web that specifically caters to individuals seeking to obtain and distribute child pornography. *see* Dkt No. 28 at ¶ 5 ("Search Warrant Affidavit"). In November 2015, law enforcement reviewed a post on Bulletin Board A in the "Pre-Teen Hardcore" sub-forum that contained a link to what was described as "4 small clips of beautiful pussy and ass, some include finger inserting." *Id* at ¶ 7. Below the description and link, the post also contained twenty video thumbnail images that depicted an adult male using his fingers to spread the vagina of a girl who appeared to be a toddler. *Id.* at ¶ 7.

A File Sharing Site hosted the four videos in the link posted at Bulletin Board A, *id.* at ¶ 11, and a court order under 18 U.S.C. 2703(d) to the File Sharing Site revealed the IP addresses of computers that had attempted to access that link. One of those IP addresses traced back to a computer at Bosyk's residence. *Id.* at ¶¶ 15- 18. Based on this information, a federal magistrate judge issued a warrant to search Bosyk's home. The search revealed that Bosyk had downloaded thousands of images and videos of child pornography. *See* Dkt No. 44 at ¶ 12 ("Presentence Report" or "PSR").

This prosecution began with the filing of a criminal complaint in October 2017. PSR at ¶ 1. A grand jury sitting in Alexandria, Virginia later returned a two count indictment charging the defendant with possession of child pornography in violation of Title 18, United States Code,

Section 2252(a)(4)(B) and receipt of child pornography in violation of Title 18, United States Code, Section 2252(a)(2). *Id.* at ¶ 4.

On February 12, 2018, the defendant pleaded guilty to receipt of child pornography, but preserved his right to appeal the lawfulness of the search warrant authorizing the search of his home. The Court later sentenced the defendant to 60 months imprisonment.

On direct appeal, the defendant's attorney filed a brief arguing that the warrant authorizing the search of his home was not supported by probably cause. The Fourth Circuit rejected that argument, reasoning that because the computer at Bosyk's home accessed the link containing child pornography on the same day it appeared on the secretive online message board, "the magistrate judge therefore had a substantial basis for concluding that searching Bosyk's address would uncover evidence of wrongdoing." *Bosyk*, 913 F.3d at 326. Bosyk then filed a motion to rehear the matter en banc, but the Fourth Circuit declined to hear the case en banc. *United States* v. *Bosyk*, 786 Fed.Appx.398 (4th Cir. 2019).

According to the Bureau of Prisons Inmate Locator, the defendant's anticipated release date is September 10, 2022.

## Argument

I.  **The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.**

The Federal Bureau of Prisons ("BOP") is actively working to contain the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C.

3

§ 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[1]  This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  This provision is in keeping with BOP's authority to designate where an inmate serves a sentence.  Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP.  As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2).  Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2]  The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed over 7,600 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released.  Inmates do not have to apply to be considered for home confinement.

---

[1] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine.

Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and presently remain suspended to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant

envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts.  And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

In any event, the Court's adjudication of the defendant's motion necessarily touches on many of the following fact-specific issues:

- *Safety of place of home detention.*  An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[3]  New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.*  Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.*  Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.*  To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an

---

[3] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so. For the reasons that follow, this is not such a case.

**II.     The defendant has not established a sufficient basis for compassionate release.**

The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief."). Compassionate release is not appropriate on these facts because the defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release. As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, — F. Supp. 3d —

8

, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).[4]

Because the defendant has not satisfied these criteria, the Court should deny his motion.

### A. The defendant has not shown that his prison facility is at heightened risk of a coronavirus outbreak.

While Bosyk can show that his obesity is an extraordinary and compelling reason for compassionate release, with respect to an individualized showing regarding Bosyk's prison facility, his claim is unpersuasive. He currently is incarcerated at FCI Allenwood Low, a low security BOP facility. According to the latest statistics available from the BOP, FCI Allenwood Low currently has no inmates currently testing positive for COVID-19; one inmate previously testing positive who has since recovered; and no inmate deaths. Those numbers are relative to a total inmate population of 1,003. The facility continues to adhere to the BOP modified operations plan described above in the government's responsive pleading. For all of these reasons, Bosyk has not shown, in any particularized fashion, that he is entitled to additional relief based on the risk of contracting COVID-19. *Cf. United States v. Campos-Ramenthol*, 805 F. App'x 328, 330 (5th Cir. 2020) (defendant not entitled to pretrial release due to COVID-19 where "[t]here were no reported cases of COVID-19 at the jail" where he was housed and "the jail has procedures in place in case of an outbreak, including the isolation of high-risk inmates").

### B. The defendant has not shown that his release plan reduces his risk of contracting COVID-19.

As one magistrate judge has concluded, when there are no cases of COVID-19 at a particular facility, "it would be speculative to say whether [a defendant's] release plan … truly

---

[4] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

mitigates [his] health risks rather than potentially exacerbating them." *United States v. Duncan*, — F. Supp. 3d —No. 18-CR-40030-1 (HLT), 2020 WL 1700355, at *1 (D. Kan. Apr. 8, 2020).

That same logic applies here. Indeed, the defendant proposes to be released to live with his wife and young son in Hamilton, Virginia. *See* Dkt. No 83. But Virginia has identified 142,010 instances of coronavirus infection, leading to 3,060 deaths. And Loudoun County, where Hamilton is located, has 6,698 instances of coronavirus infection, leading to 123 deaths. *See* Coronavirus Data, https://www.nytimes.com/interactive/2020/us/virginia-coronavirus-cases.html. Those numbers stand in stark contrast to the zero cases of COVID-19 at FCI Allenwood Low.

Moreover, in light of the risks posed by his release, the defendant does not, as he claims, have "release plan that will adequately address the concerns presented by COVID-19." Dkt. No. 83 at 11. Indeed, defendant's "plan" is very sparse, including that Bosyk "would live with his wife and young son" and his "health needs can be covered by his wife's health insurance." *Id.* at 10.

Notwithstanding defendant's release plan, defendant's release will increase the risk of exposure for defendant, his family, and anyone with whom they come into contact, including court employees, like probation officers, who will be required immediately interact with and supervise defendant under demanding conditions, likely for an extended period of time. Further, it is not clear that defendant's immediate release would afford him unrestricted access to his private healthcare providers.

As demonstrated by the record in this case and the defendant's own exhibits, he received health care treatment while incarcerated. The defendant has not shown that he would have greater, unfettered access to medical care during this pandemic if released. *See United States v.*

10

*Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) ("Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety."); *see also United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) ("[I]t is not clear to this Court that Defendant would be safer from the virus on home confinement."); *United States v. Brady*, No. 18-CR-316 (PAC), 2020 WL 2512100, at *4 (S.D.N.Y. May 15, 2020) (denying compassionate release because releasing the defendant "from prison may be to simply take him out of the proverbial frying pan and place him into the fire, as the general public continues to suffer from COVID-19 as well."); *United States v. Chappell*, No. 16-CR-512 (LTS), 2020 WL 3415229, at *3 (S.D.N.Y. June 22, 2020) ("The record also demonstrates that Mr. Chappell is regularly receiving appropriate medical care at his facility, and Mr. Chappell has provided no indication that he will have ready access to the requisite medical care for his serious health concerns if his request for immediate home confinement or transfer to a halfway house is granted.").

**C.    In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.**

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the offenses involved firearms, and the defendant's criminal record. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate-release motion. Here, these factors counsel against granting a reduction in the defendant's sentence.

While the defendant argues that he was convicted of a "non-violent offense," *see* dkt

11

no.83 at 9, that is simply not true. Section 3143(b)(2) of Title 18, United States Code, mandates that a defendant be detained if he has been convicted of an offense described in subparagraphs (A), (B), or (C) of § 3142(f)(1) and has been sentenced to a term of imprisonment. Subparagraph (A) of § 3142(f)(1) includes an offense that is a "crime of violence," the definition of which incorporates any felony under Title 18, Chapter 110. § 3156(a)(4)(C).  Receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) falls within Title 18, Chapter 110. It is, therefore, a "crime of violence" under § 3142(f)(1).

      Putting whether the defendant's conviction constitutes a crime of violence to the side, the conduct that the defendant engaged in is plainly disturbing. He was an avid consumer of child pornography, including child pornography that featured children as young as toddlers. He used the dark web to consume such content and to attempt to hide his criminal behavior. His conduct evidences that he is a danger to the community and should remain detained.  *See Coleman v. United States*, No. 4:17-CR-69 (RAJ), 2020 WL 3039123, at *5 (E.D. Va. June 4, 2020) ("[T]he Court is concerned that Petitioner's release plan does not adequately protect the public from the potential of a subsequent offense involving child pornography." (citing 18 U.S.C. § 3553(a)(2)(C); U.S.S.G. § 1B1.13(2))); *United States v. Sears*, No. 19-CR-21 (KBJ), 2020 WL 3250717, at *3 (D.D.C. June 16, 2020) ("[G]iven the ease with which child pornography is accessible in the modern world, Sears's release is likely to require stringent and frequent monitoring.  This, too, poses a risk to the community, because the need for intensive monitoring in the age of COVID-19 would likely result in heightened safety risks ... to the probation officers who would be tasked with monitoring his behavior….") (internal quotation marks and citation omitted).

\* \* \*

Finally, if this Court were to disagree with the United States' position, any release order should require defendant to undergo a 14-day quarantine controlled by BOP.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

    Respectfully submitted,

    G. Zachary Terwilliger
    United States Attorney


    _____/s/_____

    Nathaniel Smith III
    Assistant United States Attorney
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, VA 22314
    Office:  (703) 299-3700
    Fax:    (703) 299-3980
    Email:  Nathaniel.Smith2@usdoj.gov

**Certificate of Service**

I certify that on September 23, 2020, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By:         /s/
Nathaniel Smith III
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:  (703) 299-3700
Fax:    (703) 299-3980
Email:  Nathaniel.Smith2@usdoj.gov